# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-24-00262-CV

---

**R. M., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY**
**NO. 22-0070-CPSC1, THE HONORABLE BRANDY HALLFORD, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

R.M. (Father) appeals the trial court's final order in a suit affecting the parent-child relationship, entered after a jury trial. The Texas Department of Family and Protective Services (the Department) initially filed the suit seeking termination of both Father's and A.M.'s (Mother) parental rights to their one-and-a-half-year-old daughter, Sara.[1] Sara's maternal aunt and uncle (Intervenors), with whom she had been residing for the past year, filed a petition to intervene in the suit, seeking sole managing conservatorship of Sara. By the time of trial, the Department had abandoned its petition to terminate Father's parental rights, and the case went to the jury on the issue of conservatorship alone. At the end of trial, the jury found by a preponderance of the evidence that Intervenors should be named sole managing conservators of Sara without geographic

---

[1] For the child's privacy, we will refer to her by an alias and her family members by their relationships to her. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

restriction and that neither Father nor Mother should be named possessory conservator. The trial court adopted the jury's findings and ordered that Intervenors have sole managing conservatorship of Sara, that Father and Mother have no access or possession rights to Sara, and that Father and Mother pay child support to Intervenors. Father timely filed this appeal. In two issues, Father contends that (1) the trial court erred in allowing Intervenors to intervene in the suit, and (2) the trial court abused its discretion in denying Father all possession of and access to Sara.[2] We affirm.

## BACKGROUND

Father is the biological father of Sara, who was born in Texas in July 2022. Mother and Father were living in California until shortly before Sara's birth when Mother moved to Texas. Mother has family in Texas, but Father has no connections to Texas and has lived in California his whole life. When Sara was born, the Department received a report that Mother was using methadone while pregnant because Sara tested positive for drugs at birth and was suffering from severe withdrawals as a result. The Department required Mother to enter and complete a 90-day stay in a drug rehabilitation facility. In early November 2022, Mother was unsuccessfully discharged from the facility before she completed the 90 days. The Department did not place Sara with Father in California because Father was actively using methamphetamine at the time. As a result, the Department filed its original petition for protection of a child, for conservatorship, and for termination in suit affecting the parent-child relationship on October 24, 2022, in Williamson

---

[2] The trial court's order also reflected the jury's finding that Mother should be denied both possession and access to Sara and that Mother should pay child support to Intervenors. However, Mother is not a party to this appeal, and accordingly, this memorandum opinion only addresses the trial court's findings as they pertain to Father.

County, and was named temporary managing conservator of Sara the same day. While the case was pending, Sara went to live with Intervenors in their home in Williamson County.[3]

On November 23, 2022, the Department held a meeting with Mother and Father where the parties engaged in a family strength and needs assessment (FSNA). As a result of this meeting, the Department created a family service plan for Father, which included a permanency goal of family reunification. The requirements of the service plan were adopted as orders of the court and required that Father: (1) obtain stable housing and employment; (2) attend, participate in, and successfully complete a parenting class; (3) regularly attend a 12-step support group at least once per week and find an appropriate sponsor; (4) complete a drug and alcohol assessment (OSAR) and follow all treatment recommendations; (5) submit to drug testing; (6) submit to a psychological evaluation; (7) attend weekly individual therapy; (8) not associate with known criminals and not engage in criminal activity; and (9) to report any interactions with law enforcement to the Department within 48 hours.

Because Father was in California at the time, he was unable to participate in services in Williamson County.[4] Instead, he found his own service providers in California and paid for them out of pocket. The California services were the closest equivalent to the services that Texas offered, the main difference being that the California classes were all online and self-paced. While working services, Father would fly to Texas from California once a month to attend supervised visitation with Sara, eventually being allowed six-hour, unsupervised visits for

---

[3] Sara's maternal aunt is Mother's stepsister, meaning Sara and her aunt are relatives but are not blood-relatives.

[4] Father unsuccessfully filed a motion to change venue to his county of residence in California.

3

two consecutive days. After observing Father make substantial progress in completing his services and abiding by court orders, the Department elected not to pursue termination of Father's parental rights. Around the same time, in October 2023, Intervenors moved to intervene in the suit, alleging standing based on Texas Family Code Section 102.003(9) (providing standing for "person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition") and seeking sole, non-parent managing conservatorship of Sara. Father responded with an original answer and counterpetition seeking the monitored return of Sara and sole managing conservatorship of her. In addition, both Father and the Department moved to strike the petition in intervention. After a hearing, the trial court denied the motions to strike, allowed the intervention, and the case proceeded to a jury trial on the issue of conservatorship.

## EVIDENCE AT TRIAL[5]

Over the course of four-and-a-half days, the jury heard testimony from several witnesses, including Department caseworkers Jennifer Stultz and Gabriela Rodriguez, Child Protective Services (CPS) Supervisor Lindsay Carver, Father's therapist Deborah Taber, Intervenor/Maternal Aunt, Maternal Aunt's brother, Court Appointed Special Advocate (CASA) volunteer and the child's guardian ad litem Natalie Wedgeworth, and Father. Mother did not attend trial. Evidence admitted included Intervenors' original petition in intervention, the Department's service plan created for Father, Father's psychological evaluation, Father's certificate of completion of his parenting and domestic violence classes, his relapse prevention plan, photos of Father's apartment in California, photos of Sara with Father, and photos of Sara with Intervenors.

---

[5] The following facts are taken from the testimony and exhibits entered as evidence at trial.

Father testified that he began using methamphetamine at the age of seventeen. He was first arrested for drug-related offenses at age eighteen and continued to receive related charges until the age of twenty-one, when he completed a four-month drug rehabilitation program. After completing the rehabilitation, he remained clean for the next two years. At age twenty-three, he relapsed and used drugs heavily for the next seven years. During this time, he was arrested and charged with various offenses including burglary, prostitution, stolen property, and check fraud. At age thirty, Father had a son, Reagan.[6] Reagan tested positive for drugs at birth, and California child protective services removed him from Father's custody. Reagan went to live temporarily with Father's mother (Grandmother). Shortly thereafter, Father was convicted of driving while intoxicated and served several months in prison. While in prison, Father completed the state-required services in order to regain custody of Reagan. Upon completion of his prison sentence, Father and Reagan's mother separated and Father regained custody of Reagan. At the time of trial, Reagan was nine years old and living with Father and Grandmother in their apartment in California. Father testified that he and Reagan's mother have a good co-parenting relationship and that, while no longer a couple, they are "best friends."

Father first met Mother in California around 2018 or 2019. At the time, Father was not actively using drugs. In 2020, Father's brother died by suicide, causing Father to relapse. Father testified that he immediately left Reagan at home with Grandmother and began using drugs because he "didn't want to live [anymore]." At the same time, Father began dating Mother, and they both used heavily together—according to Father, Father's drug of choice was methamphetamine while Mother used heroin and fentanyl—and from 2020 to 2022, Father and

---

[6] We use an alias to protect the child's identity. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

Mother engaged in an off-and-on relationship. During one of the "off" times, Father began dating Reagan's babysitter. The babysitter eventually moved in with Father, Reagan, and Grandmother, and in 2021 Father was arrested for domestic battery against the babysitter. Father testified that, at the time this occurred, Father was actively using and that Reagan did not witness the offense, as he was either with Grandmother or with his mother.[7] In November 2021, Father and Mother discovered that Mother was pregnant with Sara. Father testified that he tried to stop Mother from using drugs while pregnant and even offered to help her get into a medical detox facility but that she consistently refused his offers for help. He testified that the two discussed Mother giving birth in California but that Mother changed her mind at the last minute and decided to give birth in Texas because Mother believed she would be less likely to be tested for drugs.

In late July 2022, Father received a text from Mother's mother that Sara had been born. Sara remained in the Neonatal Intensive Care Unit (NICU) for approximately ten to twelve days due to the effects of the drugs in her system. Father flew from California to see Sara for the first time when she was approximately two weeks old. As part of the Department's requirements, Mother agreed to attend a 90-day rehabilitation program, where Sara joined her after her discharge from the hospital. Father testified that the plan was that Mother would come back to California with Sara after finishing rehabilitation and that they "would be a family." Father flew again to Texas in September 2022 to visit Sara. That same month, Mother was unsuccessfully discharged from the facility for failure to follow the rules. After leaving the facility, Mother arrived at her family's house with Sara. Mother's stepbrother testified that Mother was acting erratically and appeared high and that as a result he decided to call the police out of concern for Sara's safety.

---

[7] The evidence at trial was unclear as to whether Father was charged and convicted for this offense.

The police arrived, and Mother was arrested on outstanding warrants. Upon Mother's arrest, Sara went to live with Intervenors.

**Services**

Department caseworker Gabriela Rodriguez testified that the Department's original permanency plan in this case was family reunification and then relative adoption. The Department issued a family plan for Father, and he began working services once he found equivalent classes offered by the state of California. Testimony at trial was undisputed by all witnesses that Father successfully completed and complied with all courses and aspects of his family service plan. Rodriguez stated that Father did not miss any assigned drug tests; completed the domestic violence and parenting courses; completed a several-month intensive outpatient program (IOP) which required weekly drug testing; obtained a steady job working twelve hours per day, six days a week; obtained long-term housing that was appropriate and safe for Sara; had a relapse plan in place; obtained a sponsor; attended weekly therapy appointments; had abstained from criminal activity; and had cut off all communication with Mother due to Mother's continued drug use.

**Father's changed behaviors**

Several witnesses testified about whether they believed Father had demonstrated positive behavioral changes throughout the case. The first Department caseworker assigned to the case, Jennifer Stultz, testified that the Department's biggest concerns with Father were his arrests for drugs and alcohol and domestic violence. While the initial permanency plan was family reunification, Stultz stated that one of the reasons the Department changed the plan to fictive kin adoption in May 2023 was because of Father's job instability and his tumultuous relationship with Mother. When the case began, Father was unemployed, then he worked part-time with

7

Grandmother in her self-employed business cleaning homes, next he worked for a trucking company before quitting after the ticket for reckless driving, and then he landed his current job as a security guard. The permanency plan was also changed as a result of Stultz's witnessing Mother and Father fighting just before a visit with Sara in May 2023. Stultz also testified that she had witnessed Father being angry and that she "discontinued a conversation" over the phone with Father and Grandmother due to the two being "aggressive" and argumentative.

CASA volunteer and Sara's guardian ad litem Natalie Wedgeworth testified that she had been involved in the case since November 2022. A majority of Wedgeworth's testimony centered on her interactions with Mother. She stated that there was always a constant "back and forth" with Mother wanting to participate in services. She testified that her communication with Mother was spotty and that she never knew where she was at the time or if she was currently abusing substances. According to Wedgeworth, Mother did not want Father to be in Sara's life. Mother told her of a time when Father hit her in the face and nose so hard that "she saw stars" and that Father had dressed in drag and asked Mother to "pimp him out." Mother also told Wedgeworth about a video she received from Father in late October 2022 where Father had a noose around his neck and was talking about killing himself. According to Wedgeworth, Mother believed Father sent the video in an attempt to get Mother to get back together with him. Wedgeworth stated that she spoke to Father once a week until February 2024 when, during one phone call, Father became upset with Wedgeworth after learning that Mother had sent the noose video and drag photos to Wedgeworth and about the possibility of them being admitted at trial. She said that Father appeared angry over the phone as well and that she had concerns about whether Father was able to control his anger. Wedgeworth's supervisor advised her not to communicate with Father any more than necessary and only through text messages. Despite these concerns, Wedgeworth

8

admitted she had no issues with the photos of Father's current apartment, nor did she ever have issues or concerns with Father's interactions with Sara during visitations. She testified that she believed that it was in Sara's best interest for Intervenors to have sole managing conservatorship, based on her overall belief that Father has not shown that he has changed his behaviors.

Father's therapist and Department expert witness Deborah Taber testified about Father's behavioral changes and commitment to his sobriety. Taber is a licensed professional counselor who has twenty-nine years of professional experience, mostly working with clients affected by substance abuse and domestic violence. By the time of trial, she had had approximately twenty-five therapy sessions with Father. She stated that Father enjoys being sober and that he "really wants to maintain his sobriety." She stated that she encouraged him to not allow contact with Mother because she is actively using drugs and that Father took this advice and has cut off contact with Mother and with other people with whom he previously abused drugs. Taber testified that Father has been open and honest from the start about taking responsibility for his actions and that every domestic violence incident occurred while he was high on methamphetamine. CPS Supervisor Carver also testified that "[Father] has never stated that he was a victim [of domestic violence]. He's always taken accountability for his behaviors in the past." Taber stated that, in her professional experience, domestic violence is motivated by a need for power and control, and that Father "does not come across as arrogant or someone who needs power and control." She testified that he does get upset but that he is not volatile. She stated: "he needs to vent and then he calms down fairly quickly." Taber explained that she allows her patients to call her whenever they feel the need and that Father has called her on occasion when he is upset so that he can calm down. Taber discussed Father's diagnosis of depression and explained that in therapy sessions they work through Father's trauma associated with physical and emotional abuse as a child at the

9

hands of his father. Taber stated she has not had any doubts about Father's honesty. She stated that Father has requested to continue therapy sessions with her after the case is over, and he has even asked to have Grandmother involved in the sessions. Taber testified that Father has "done everything" that she has asked him to do.

Rodriguez testified that, as a result of Father "demonstrat[ing] behavioral changes" and completing all required services, the Department's permanency plan was changed in December 2023 to family reunification. She stated that these changes have been "shown by his consistent engagement by traveling from California once a month to see his daughter. He has maintained stable employment as well and [has] been promoted to a supervisor. He has the support system that is beneficial for himself and for the child. He also has shown the behavioral changes once again that are needed to be protective by telling the Department when [Mother] tries to contact him or make any type of other advancement towards him." She testified that Father believed that, based on the services he completed, he does not see himself falling back into his previous lifestyle of drugs and criminal activity "now that he has the skill set needed to behave differently."

Carver echoed much of Rodriguez's testimony, explaining that the permanency plan was changed to family reunification because "at the time[,] [Father] was testing clean on all of his drug test[s], he had a stable home, he had a stable job, and he was doing everything that he could in our eyes." When asked what the Department's thoughts were on Father living with Grandmother, Carver stated: "I think the more support, the better," and "I understand that maybe some of the choices in the past can be questionable in some people's eyes, but I do believe that she is supportive, and I think that's positive for [Father]." Carver stated that the Department did not believe that placing Sara with Intervenors would be in her best interest because "it's in a child's best interest to be raised by their parent if that parent is willing and able to raise them." She further

10

stated: "I think it's in Sara's best interest to be raised by her dad if he is able to." In contrast, Carver stated that the Department did not recommend future contact or visitation between Mother and Sara because the Department believes it would "significantly impair [Sara] or be harmful to her welfare, emotional well-being." She stated she had no safety concerns about Sara being returned to Father, nor did she have any concerns about Father's living situation or his ability to take care of Sara and Reagan.

**Sara's life with Intervenors**

At the time of trial, Sara was almost twenty-one months old and had been living with Intervenors for approximately eighteen months. Intervenors have three biological children, ages twenty, seventeen, and eleven. Intervenor/Maternal Aunt testified at trial. She stated that she used to work in child special education and that she and her husband recently became licensed foster parents. She testified that she was at the hospital when Sara was born and that she cut Sara's umbilical cord. In addition to discussing Sara's withdrawal symptoms necessitating her stay in the NICU, Maternal Aunt stated that Sara had various health issues for the first six months of her life, including ear infections, pink eye, COVID-19, RSV, and respiratory issues. She also had sensory issues that caused her to pick at her skin and had sleep issues where she would randomly "startle" awake. Sara was also experiencing difficulties in meeting certain developmental milestones such as crawling. To address these issues, Intervenors had tubes placed in her ears, provided her with an inhaler, and enrolled her in occupational therapy.

When asked at trial why Intervenors were seeking sole managing conservatorship of Sara, Maternal Aunt stated: "because I believe that [Sara] deserves a safe and secure and loving family in life. She deserves that." She further elaborated that she felt that her and her husband's

11

"concerns" were not "being heard" by the Department. Maternal Aunt explained that she felt there was not adequate communication between Intervenors and the Department caseworkers, providing examples such as not knowing when visitation would occur and how long they would take place. She also stated she wished the Department had required Father to take part in "more realistic visits where you're not just out having fun." She stated that she therefore believes Father has not demonstrated that he is a "parental type" to Sara and that instead he is "more of like a playmate." Maternal Aunt was concerned about Sara leaving to live with Father because she and Sara have a "secure attachment" that, if removed, could cause Sara "trauma." Finally, Maternal Aunt testified that, while she felt that Father was "trying," she believed him to be less than completely truthful.

However, Maternal Aunt also testified that all of her interactions with Father were good and that they never had any issues with him. She explained that, in the event Intervenors were granted their request to have sole conservatorship of Sara, Father should still get to be in Sara's life and see her from time to time. Maternal Aunt could not say the same about Mother, explaining that Intervenors have kept their address hidden from Mother for the sake of Sara's safety. Maternal Aunt agreed that Father had made progress on his sobriety and his service plan.

Father testified about his efforts to attend all visitations with Sara. He explained that he has flown to Austin once a month for about a year. At first, Father was only allowed supervised visits with Sara for one-and-a-half hours, two days in a row. Each visit required him to pay for a plane ticket, a hotel, and a rental car. Each time he would pack a diaper bag with diapers, snacks, bottles, and anything else Sara would need. He explained that they took trips to Mount Playmore and Indigo Play and ate at Cracker Barrel. By the time of trial, Father was granted unsupervised visitation with Sara for six hours a day, two days in a row. Responding to Maternal Aunt's concern that Father and Sara did not have "more realistic visits," such as those involving

12

overnights, Father explained that he was never given the chance. Carver confirmed that the overnight visits did not occur but stated that it was through no fault of Father's and confirmed that the Department was in favor of overnight visits but explained that they did not occur due to "a disagreement between the advocates in this case." Rodriguez observed several of the visits and testified that they have been appropriate and that she had no complaints or concerns about them. She stated that Father and Sara are affectionate toward one another and that she calls him "Daddy" and blows him kisses. Wedgeworth testified that she attended four visitations, that the interactions were "sweet," that Father would bring Sara toys, that the two appeared to be attached to one another, and that she had no concerns about the visits.

Father also explained that he had been paying child support to Intervenors since March 2023 and that between the child support and the travel expenses, about eighty percent of his income was going to his efforts to see Sara. Father's apartment was set up for Sara to live there in that Father had set up her own room with toys, diapers, and stuffed animals, and the whole apartment was baby-proofed in preparation for her arrival. He planned for Sara to either be in daycare or pre-school during the day and for Grandmother to be a back-up to watch Sara whenever he was at work. He also had plans to enroll Sara in the same state-sponsored health insurance as Reagan. Father stated that Reagan has never met his sister and was excited to finally get to meet her. Father expressed his gratitude towards Intervenors and testified that he wanted them to be a part of Sara's life. He stated that he wants them involved and that "they are great people."

## ANALYSIS

### 1. Intervention

In his first issue, Father argues that Intervenors lacked standing to intervene and that, therefore, the trial court erred by granting their petition in intervention.

In order to establish standing to intervene in a suit affecting the parent-child relationship, a party must satisfy the provisions of the relevant Family Code section. *See* Tex. Fam. Code § 102.003. Standing is a question of law that we review de novo. *See In re J.O.L.*, 668 S.W.3d 160, 170 (Tex. App.—San Antonio 2023, pet. filed). Intervenors sought standing under Texas Family Code Section 102.003(a)(9). This section provides that a person other than a foster parent may only be granted leave to intervene if the party would have standing to file an original suit as provided by Section 102.003(a)(9), meaning the party must have had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition in intervention. *See* Tex. Fam. Code § 102.003(a)(9).

Intervenors' petition claimed they had care, control, and possession of Sara since October 21, 2022. At the hearing on the petition in intervention, none of the parties disputed the fact that Sara had been in the Intervenors' care continuously since that date. The record reflects that Intervenors filed their petition on November 27, 2023. Thus, because Intervenors had care, control, and possession of Sara for at least six months before they filed their petition in intervention, Intervenors would have had standing to file an original suit under Section 102.003(a)(9), and thus they meet the requisite standing under this statute. Accordingly, we

14

conclude that the trial court did not err in finding that Intervenors had standing to intervene in the suit.[8] We overrule Father's first issue.

## 2. Possession and access

Father does not challenge the jury's finding that Intervenors should have sole managing conservatorship of Sara, or the jury's finding that Father should not be appointed as a possessory conservator. Instead, he argues on appeal that the trial court abused its discretion in denying him *all* access to and possession of Sara, regardless of Father's status as a conservator.

In its charge to the jury, the trial court asked the jury whether Father should be appointed possessory conservator based on a preponderance of the evidence and instructed the jury that a parent who is not appointed a managing conservator shall be appointed possessory conservator "unless the appointment is not in the best interest of the child and possession or access by the parent would endanger the physical or emotional welfare of the child." *See* Tex. Fam. Code § 153.191 (stating that there is presumption that court shall appoint parent as possessory conservator if not appointed managing conservator unless court "finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child"). By its finding that Father should not be appointed possessory

---

[8] Father argues that Intervenors lacked standing under Texas Family Code Section 102.003(a)(9) and Section 102.004(b). Section 102.004(b) provides that "a grandparent, or another relative of the child related within the third degree by consanguinity, may file an original suit requesting managing conservatorship . . . ." *See* Tex. Fam. Code § 104.002(b). The child's attorney ad litem argues on appeal that the trial court was not required to consider Section 102.004(b) because Intervenors were not related to Sara within a third degree of consanguinity pursuant to Texas Government Code Section 573.023. *See* Tex. Gov. Code § 573.023 (providing computation of degree of consanguinity). As it was undisputed that Intervenors are not blood-related to Sara, we conclude that this section does not apply and thus we do not address it.

conservator, the jury implicitly found that possession and access by Father would not be in Sara's best interest and would endanger Sara's physical or emotional welfare.

The Family Code states that a party is entitled to a verdict by the jury "and the court may not contravene a jury verdict" on the issue of the appointment of a possessory conservator. *Id.* § 105.002(c)(1)(C). In addition, the jury is not permitted to determine a term or condition of possession of or access to a child. *Id.* § 105.002(c)(2)(B). Accordingly, we note that this case is distinguishable from cases in which a parent was appointed as a conservator but given no access or possession and instead presents a situation in which Father was not given access or possession after a jury specifically determined that appointing him as possessory conservator would not be in Sara's best interest and would endanger her physical or emotional welfare. *See Chad Lee S. v. Melinda A.S.*, No. 02-14-00135-CV, 2015 WL 7820584, at *11 (Tex. App.—Fort Worth Dec. 3, 2015, no pet.) (mem. op.) (distinguishing types of cases). The unchallenged finding in this case by the jury that Father should not be appointed possessory conservator because it is not in Sara's best interest and because it would endanger her emotional or physical well-being precluded the trial court from granting Father any possession of or access to Sara. *See Hopkins v. Hopkins*, 853 S.W.2d 134, 138 (Tex. App.—Corpus Christi–Edinburg 1993, no writ). Therefore, we cannot conclude that the trial court abused its discretion in denying Father all possession of and access to Sara. *See Chad Lee S.*, 2015 WL 7820584, at *1, *11 (affirming denial of possession and access to parent whom jury found should not be appointed possessory conservator after concluding that trial court did not abuse its discretion by not awarding access and possession).[9] We overrule Father's second issue.

---

[9] By finding that the Intervenors should be appointed the child's sole managing conservator and that Father should not be appointed possessory conservator, the jury appears to

16

## CONCLUSION

Having overruled Father's issues, we affirm the trial court's judgment.

_____

Edward Smith, Justice

Before Justices Baker, Smith, and Theofanis

Affirmed

Filed:   October 18, 2024

---

have placed its trust in the Intervenors to determine when and if Father should have contact with the child going forward.  However, because Father's parental rights were not terminated, he retains the right to file a motion to modify the order should circumstances change.  *See* Tex. Fam. Code § 156.101 (providing grounds for modifying order establishing conservatorship or possession and access).

17